Charles Kuhn, Appellant, *v.* Erastus C. Knight, as Mayor of the City of Buffalo, et al., Respondents.

1. Railroads — Requirement of Railroad Law for Sale of Franchise for Street Railroad at Public Auction Not Applicable to City of Buffalo. The requirement in the first sentence of section 93 of the Railroad Law (L. 1890, ch. 565, amd. L. 1901, ch. 494) that the consent of the local authorities in cities containing 1,250,000 inhabitants or more to the construction of a street railroad therein must contain a condition for the sale of the franchise at public auction, cannot be construed to apply to the city of Buffalo, because of the subsequent provision of such section that "the provisions of this section as now amended shall apply to all cities of the first class," for, although the city of Buffalo is a city of the first class, it has not the population prescribed in the first sentence referred to, and effect should be given to both provisions of the statute by construing the subsequent declaration as rendering all cities

of the first class liable to the rules and regulations established by the amended section, save those provisions which by the express language of the first sentence are confined to cities of the first class having a prescribed population.

2. Railroad Law — Extension of Street Railroad — Consents of Local Authorities. Where, under the provisions of section 91 of the Railroad Law (L. 1890, ch. 565, as amd.) prescribing the common council of a city, subject to the veto power of the mayor, to be the local authorities whose consent is necessary to the construction of a street railroad therein, and that if the exclusive control of any street or property which is to be occupied by such railroad is vested in any other authority, the consent of such authority shall also be first obtained, a railroad company after obtaining the consent of the common council to an extension of its railroad upon a street used as a park approach and under the control of the park commissioners also obtained the consent of the latter body, the validity of the latter consent cannot be successfully attacked in a taxpayer's action upon the ground that it differs in its terms from the consent of the common council, since the requirements of the Constitution (Art. 3, § 18), and of the Railroad Law, in regard to the consent of the local authorities and of those having the exclusive control of any street or avenue, have been fully complied with by obtaining the consents in question, and if the terms upon which the park commissioners granted their consent are more rigorous as to the railroad company than those exacted by the local authorities of the city no one has any cause to complain except the railroad corporation itself.

*Kuhn* v. *Knight*, 115 App. Div. 837, affirmed.

(Argued November 22, 1907; decided December 20, 1907.)

Appeal from a judgment of the Appellate Division of the Supreme Court in the fourth judicial department, entered November 26, 1906, affirming a judgment in favor of defendants entered upon a decision of the court on trial at Special Term.

The nature of the action and the facts, so far as material, are stated in the opinion.

*Frank C. Ferguson* for appellant. The consent of the common council is illegal because it does not contain the condition that the franchise shall be sold at public auction. (L. 1890, ch. 565, § 93.) The alleged consent of the local authorities is no consent at all, because it is indefinite, uncertain, irregular and incomplete. (Const. of N. Y. art. 3, § 18 ; *Wetmore* v. *Story*, 22 Barb. 414.)

*Louis E. Desbecker,* Corporation Counsel (*Samuel F. Moran,* of counsel) for City of Buffalo, respondent. Section 93 of the Railroad Law, as amended by chapter 494 of the Laws of 1901, requires that the consent of the common council of the city of Buffalo to the construction and maintenance of a street surface railroad shall contain the condition that the franchise be sold at public auction to the corporation which will agree to give the city the largest percentage of its gross annual receipts. (*Heerwagen* v. *C. S. Ry. Co.,* 179 N. Y. 99; *Matter of N. Y. & B. Bridge,* 72 N. Y. 527; *Montclair* v. *Ramsdell,* 107 U. S. 152; *People ex rel. Mason* v. *McClave,* 99 N. Y. 83; *Matter of Watson,* 171 N. Y. 256.) The consent of the park commissioners to the construction of a railroad in the Filmore avenue park approach is independent of the consent granted by the common council, and is in all things regular and valid. (L. 1890, ch. 565, § 91.)

*Porter Norton* for International Railway Company, respondent. The plaintiff cannot maintain a taxpayer's action under the facts and circumstances of this case. (*Bush* v. *O'Brien,* 164 N. Y. 205; *Gallagher* v. *Keating,* 40 App. Div. 81; 171 N. Y. 657; 57 App. Div. 626; *Adamson* v. *N. E. R. R. Co.,* 89 Hun, 261; *Kittinger* v. *Buffalo Traction Co.,* 160 N. Y. 377; *Erie R. R. Co.* v. *Buffalo,* 96 App. Div. 458; *Zeigler* v. *Chapin,* 126 N. Y. 342; *Talcott* v. *City of Buffalo,* 125 N. Y. 280; *O'Connor* v. *Walsh,* 83 App. Div. 179; *McCrea* v. *Chahoon,* 54 Hun, 577.) The separate and distinct consents of the common council and the park commissioners, as obtained by the defendant railway company, were sufficient and in compliance with law. (L. 1890, ch. 565; L. 1905, ch. 650; *Matter of B. S. R. R. Co.,* 34 Hun, 414; *Matter of T. F. S. R. R. Co.,* 102 N. Y. 343.) The consents of the local authorities and of the park commissioners were not invalid because they did not require a sale at public auction. (*Heerwagen* v. *C. S. Ry. Co.,* 179 N. Y. 99; *Matter of N. Y. & B. Bridge,* 72 N. Y. 527; *Montclair* v. *Ramsdell,* 107 U. S. 152; *People ex rel. Mason* v. *McClave,*

99 N. Y. 83; *Fisher* v. *N. Y. C. R. R. Co.*, 46 N. Y. 644; *C. R. R. Co.* v. *Virginia*, 94 U. S. 718; *Matter of N. Y. E. R. R. Co.*, 43 N. Y. S. R. 651; 133 N. Y. 690; *Tenn.* v. *Whitworth*, 117 U. S. 129; *Bohmer* v. *Haffen*, 161 N. Y. 390; *Green Co.* v. *Conness*, 109 U. S. 104.)

WILLARD BARTLETT, J. This is a taxpayer's suit attacking the validity of consents given by the common council and the board of park commissioners of the city of Buffalo to the construction of certain street railroad extensions by the International Railway Company in the city of Buffalo. These consents are alleged to have been unlawful : (1) Because they did not contain a condition that the right, privilege and franchise to use the streets to which they referred for the purpose of constructing a street railway therein be sold at public auction to the bidder who will agree to give to the city the largest percentage per annum of the gross receipts of the corporation to whom the consent is given ; (2) because the railroad, the construction of which the consents purported to authorize, will be a new and distinct railroad and not an extension ; (3) because the consent of the board of park commissioners of the city of Buffalo purports to grant the franchise for a term of twenty-five years which is in excess of the authority of said board ; and (4) because there is a variance between the terms of the consent granted by the common council and the terms of the consent granted by the board of park commissioners, these bodies together constituting the local authorities who must unite on the terms of a common consent in order to make it lawful.

The contention of the appellant that no consent of the local authorities to the occupation of a street for railroad purposes in the city of Buffalo is valid unless it provides for a sale of the franchise at public auction to the highest bidder is based upon the provisions of section 93 of the Railroad Law. That section, as amended by chapter 494 of the Laws of 1901, does provide at the beginning thereof that such a condition must be contained in such consent of the local

authorities "in cities containing twelve hundred and fifty thousand inhabitants or more according to the last Federal census or city enumeration." If this were all, it plainly could not apply to the city of Buffalo; but it is supposed to have been rendered applicable by other words which appear toward the end of the section and which were added by the amendment of 1901. These words are as follows: "The provisions of this section as now amended shall apply to all cities of the first class." The Appellate Division held in accordance with the present contention of counsel for the appellant and counsel for the city of Buffalo, that in view of this language the requirement of section 93 of the Railroad Law as amended in 1901 to the effect that street railroad franchises must be sold at public auction, although by the first part of the section applicable only to cities having a population of twelve hundred and fifty thousand inhabitants or more, was extended by the latter portion of the section which I have quoted to all cities of the first class, and, therefore, included Buffalo.

Notwithstanding this construction of section 93, it has been held both at the Special Term and the Appellate Division that the local authorities could grant the franchise in question here without insisting upon the requirement that it be offered at public auction because of the effect of a contract known as the Milburn agreement, entered into between certain city railroad companies and the city of Buffalo on Jan. 1, 1892, and ratified by the legislature in the same year (Laws of 1892, chap. 151).

That contract is set forth in full in the appeal book (pages 55 to 70). The parties to it were the city of Buffalo, of the first part, and three corporations, the Buffalo Railway Company, the West Side Street Railway Company and the Crosstown Street Railway Company of Buffalo, of the second part. Its chief purpose was to provide for a general transfer system between these street railway companies which occupied the various portions of the city of Buffalo with their lines, and to establish a just and uniform rate of compensation which they

should pay to the city for the enjoyment of their franchises. There is not a word in the contract which expressly refers to the question presented by this appeal — that is to say, to any future right on the part of the city to insist that the franchises for future extensions should be put up at public auction or any obligation on the part of the railroad companies to submit to such a condition. At the end of the agreement, however, we find the following provision: "Eleventh. This contract shall bind the successors and assigns of the parties thereto, and is to be confined in its operation to the street railroads owned by said companies now built or authorized to be built, excepting that its operation and its terms and provisions may be extended to any future extensions thereof by the mutual consent of the parties hereto expressed in the form of a resolution of the Common Council approved by the Mayor as to any particular extension and a written consent of the companies filed with the City Clerk."

The International Railway Company is the successor in interest of those corporations which were parties to the Milburn agreement except the Crosstown Street Railway Company of Buffalo. The trial court held that the lines of railroad referred to in the consents which are attacked in this suit are extensions of the railroads of these companies to whose rights the International Railway Company has succeeded. This, I think, is a finding of fact and it is sustained by the unanimous affirmance by the Appellate Division. Construing the eleventh article of the Milburn agreement which has been quoted, the Appellate Division held that it operated to except the extensions in question here from the general requirements of section 93 of the Railroad Law to the effect that such franchises must be the subject of competition at public auction. The Milburn agreement is not only ratified by the legislature by the special act passed in 1892, to which I have referred, but is also recognized as valid in section 93 of the Railroad Law itself, for in that section it is provided that nothing therein contained shall be construed as "modifying or affecting the terms of a certain contract bearing the date of January 1st, 1892, entered into

by and between the City of Buffalo and the various street sur-
face railroad corporations therein named in such contract."
Presiding Justice McLENNAN, writing for the Appellate Divi-
sion, says that under any other construction a proposed exten-
sion of a line of one of the contracting parties could be practi-
cally prevented by a corporation which might bid a sum largely
in excess of the value of the franchise and without regard to
the efficiency of the railroad system as a whole.

The appellant insists that if the 11th subdivision of the
Milburn agreement be construed as giving the railroad com-
panies which were parties thereto the sole right to obtain a
franchise to construct extensions of their lines in the city of
Buffalo, the act of the legislature ratifying that contract
would be unconstitutional as being a private or local bill
granting to a corporation the right to lay down railroad tracks
in violation of section 18 of article III of the Constitution.
The Appellate Division answers this by saying that the Mil-
burn agreement conferred no authority upon any railroad
company in this respect but simply empowered the local author-
ities of the city of Buffalo to consent, if they say fit to do so,
to the extension of the lines of the corporations which were
parties to the Milburn agreement if they deemed it to the pub-
lic interest to allow that to be done without exacting competi-
tive bids for the privilege.

But it is not necessary to pass upon this question if the
view which I take of another branch of the case be correct.
I do not find it to be easy to concur in the assumption that
section 93 of the Railroad Law, as amended in 1901, applies
to the city of Buffalo at all so far as it relates to the sale of
franchises at public auction.

In my opinion the requirement in section 93 of the Rail-
road Law, as amended in 1901, that the consent of the local
authorities of a city to the construction of a street railway
therein must contain a condition for the sale of the franchise
at public auction, does not apply to the city of Buffalo.    That
requirement is imposed by the first sentence of section 93.
This sentence is followed by nearly four pages of printed

matter, as the statute appears in the Session Laws, and then comes the declaration that " the provisions of this section as now amended shall apply to all cities of the first class." The Appellate Division has construed the language just quoted as a repeal of the limitation in the first sentence which requires a public auction of street railway franchises only in cities having a population of twelve hundred and fifty thousand inhabitants or more. It seems to me that such a construction ignores the rule that effect should be given, if possible, to all the provisions of a statute. The limitation in the first sentence to cities of twelve hundred and fifty thousand inhabitants is rendered inoperative and meaningless (in other words, is wholly ignored) by holding that that sentence applies to all cities of the first class. On the other hand, we leave that sentence operative by construing the subsequent declaration that " the provisions of this section as now amended shall apply to all cities of the first class " as rendering all cities of the first class liable to the rules and regulations established by the amended section, save those provisions which by the express language of the first sentence are confined to cities of the first class having a prescribed population. At the present time the only city within that category is the city of New York. A strong reason for believing that it was the intent of the legislature to restrict the public sale of street railway franchises to that city alone is found in another provision of section 93 which permits the municipality under certain circumstances to relieve a street railway corporation from oppressive bids. This provision is in the following words : " The board of sinking fund commissioners of any city shall have power to reduce, compromise or release any obligation or liability to the mayor, aldermen and commonalty of such city under the provisions of chapter six hundred and forty-two of the laws of eighteen hundred and eighty-six, or of this chapter whenever, in the opinion of such board, such release or compromise shall be just or equitable, or for the public interest, the reason for any such release or compromise to be stated in the recorded proceedings of such board." No city of the

first class, except New York, had in 1901 or now has a board of sinking fund commissioners, and it is hardly to be supposed that the legislature intended to impose the obligation to sell street railway franchises at public auction upon other cities and yet to withhold from bidders therein the opportunity for relief from oppressive bids which it afforded to such bidders in the city of New York.

It is further to be noted that one of the main features of section 93 of the Railroad Law, as amended in 1901, was the confirmation of consents and the extension of consents theretofore given by local authorities to the construction of street railroads in cities of the first class. It is in this amendment that the expression "cities of the first class" first appears in the amended section, and I am strongly inclined to think that the subsequent provision declaring the section as amended to be applicable to all cities of the first class had reference to this confirmatory provision rather than to anything else.

A brief review of the course of legislation in respect to the requirement that street railroad franchises shall be sold at public auction will throw some light upon the proper construction to be given to this statute. In 1884 the general act to provide for the construction, extension, maintenance and operation of street surface railroads in cities, towns and villages empowered, but did not require, the local authorities to provide for the sale of such franchises at public auction (Laws of 1884, chap. 252, § 7). In 1886 a requirement that such franchises should be sold at public auction was made mandatory (Laws of 1886, chap. 65). In the same year, by a subsequent act of the legislature, the mandatory requirement was re-enacted but was declared not to be applicable to cities or villages of less than forty thousand inhabitants (Laws of 1886, chap. 642, § 2). In 1889 the law on the same subject was further amended without any change as to the limit of population (Laws of 1889, chap. 567). In 1890 the Railroad Law was enacted, containing section 93 in its original form and providing that the consent of the municipal authorities to the building of a street railroad must contain a condition for

the sale of the franchise at public auction "in cities contain-
ing ninety thousand inhabitants or over" (Laws of 1890,
chap. 565, § 93). In 1892 this section was amended by sub-
stituting "cities containing twelve hundred and fifty thousand
inhabitants or more" instead of ninety thousand; and in 1901
this section was still further amended and put into its present
form, which has given rise to the difficulties of construction
now under consideration, arising out of the fact that at its
very beginning it makes the requirement of a public sale of a
franchise expressly applicable only to cities of twelve hundred
and fifty thousand inhabitants, and further on declares that
the provisions of the section as now amended shall apply to
all cities of the first class.

To my mind it is very difficult to reach the conclusion that
the legislature would have left this first sentence in its present
form if it had intended to extend this particular requirement
to all cities of the first class. Such an intention, if it existed
could have been too readily expressed to permit the belief
that the limit of population was allowed to remain in the stat-
ute without any purpose; and this view is strengthened by the
fact that the tendency of legislation on the subject has been
constantly to increase the limit of population of the municipali-
ties which should be required to insist upon a public sale of
street railway franchises as a condition of the consent of the
local authorities. Thus, as we have seen, the first limitation was
to cities of forty thousand inhabitants; the next to cities hav-
ing ninety thousand inhabitants or more; and the last to cities
of twelve hundred and fifty thousand inhabitants or more. If
the legislature had meant in 1901 to alter this last limitation
and include within the scope and effect of the section the city
of Buffalo, having a population of 352,000, I think it would
have said so in plain and unmistakable terms, and not allowed
the words restricting its application to cities of twelve hun-
dred and fifty thousand inhabitants to remain in section 93 of
the Railroad Law.

A portion of one of the streets upon which the proposed
extension is to be constructed is a park approach under the

control of the park commissioners of the city of Buffalo. The charter of the city provides that the said park commissioners "shall have power upon such terms and upon the payment of such yearly license fee or such per capita tax as said commissioners may prescribe, to grant to any street railway company the privilege of laying down and operating a railway, for the carriage of passengers only, through said approaches" (Laws of 1891, chap. 105, § 314). Section 91 of the Railroad Law (Laws of 1890, chap. 565, as amended), after prescribing that in cities the common council, subject to the veto power of the mayor, shall be the local authorities whose consent is necessary to the construction of a street railroad, further provides as follows: "If in any city or county the exclusive control of any street, avenue or other property, which is to be used or occupied by any such railroad, extension or branch is vested in any other authority, the consent of such authority shall also be first obtained." The International Railway Company complied with this condition by obtaining from the park commissioners of the city of Buffalo the consent which appears in the record. The validity of this consent is attacked by the appellant on the ground that it differs in its terms from consent of the common council. I cannot see how this difference is harmful to the taxpayer. The park commissioners are not the local authorities referred to in the Railroad Law or in the Constitution (Const. art. III, § 18). They are a subordinate body in which is vested the exclusive control of certain park approaches for specified purposes, and the provision which has been quoted from section 91 of the Railroad Law does, it is true, require that their consent shall be obtained as well as that of the common council. If the terms upon which the park commissioners grant such consent are more rigorous as to the railroad corporation than those exacted in the consent from the local authorities of the city, no one has any cause to complain except the railroad corporation itself; and in the present case the International Railway Company has signified its acceptance of those conditions. The requirements of the Constitution and the Railroad Law in regard to the consent of the local

authorities have been fully complied with by obtaining the consent of the common council; and the further requirement of the Railroad Law in regard to the consent of any other authority having the exclusive control of any street or avenue to be used or occupied by such an extension as that in question here, has also been complied with by obtaining the consent of the park commissioners. Nothing in this transaction can afford the plaintiff, or any other taxpayer, just cause of complaint; and at all events it is perfectly lawful.

For these reasons, I think that the result reached in the courts below was correct, and that the judgment should be affirmed, with costs.

Cullen, Ch. J., Gray, O'Brien, Werner and Chase, JJ., concur; Vann, J., concurs in result.

Judgment affirmed.